**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

H.C. and Y.C., minors by their Next
Friend, T.M., et al.

       Plaintiffs,                              Case No. 1:20-cv-00944

v.                                         Judge Michael R. Barrett

Governor of the State of Ohio, et al.,

       Defendants.

## OPINION & ORDER

This matter is before the Court on Defendant Mike DeWine's ("DeWine") Motion to Dismiss. (Doc. 34). Plaintiffs filed a Response in Opposition (Doc. 45) and Defendant DeWine filed a Reply (Doc. 46). This matter is also before the Court on Defendant Matt Damschroder's[1] ("Damschroder") Motion to Dismiss. (Doc. 49). Plaintiffs filed a Response in Opposition (Doc. 53) and Defendant Damschroder filed a Reply (Doc. 54). This matter is also before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Docs. 21, 21-1). Defendants filed Responses in Opposition (Docs. 34, 35), and Plaintiffs filed Replies (Docs. 43, 44). The Court held oral argument on Defendant DeWine's Motion to Dismiss and the Motion for a Preliminary Injunction.[2] Additionally, the parties filed supplemental briefs in response to the Court's request for supplemental briefing. (Docs. 50, 51, 52).

---

[1] Matt Damschroder succeeded Kimberly Hall as the interim director of the Ohio Department of Job and Family Services while this case has been pending. *See* FED. R. CIV. P. 25(d).

[2] Defendant Damschroder had not yet filed his Motion to Dismiss as of the date of this hearing.

## I.  BACKGROUND

"When parents are unable to safely care for their own children, it is often grandparents, other relatives or kin, who step forward to provide a loving home for those children, either temporarily or permanently." (Doc. 50-2 PageID 1215) (Children's Bureau, U.S. Dep't of Health & Human Servs., Log No. ACYF-CB-IM-20-08, Information Memorandum (2020)). This case is about Ohio's implementation of Title IV-E of the Social Security Act and, more specifically, whether Ohio must make foster care maintenance payments to certain relative foster caregivers on behalf of certain foster children pursuant to that federal statute.

### a.  The Parties

Plaintiffs live in Ohio. Plaintiffs are four foster children and four of their respective relative foster caregivers. Plaintiffs who are foster children bring suit through their next friends, *i.e.*, their relative foster caregivers. (Doc. 1-1 ¶¶ 16-17, 21); *see* Fed. R. Civ. P. 17(c)(2). Plaintiffs who are relative foster caregivers bring suit on their own behalf. (Doc. 1-1 ¶¶ 22-24).

#### i.  Plaintiffs H.C., Y.C., and T.M.[3]

Plaintiffs allege that H.C. and Y.C. are siblings, ages one and three respectively; T.M. is their grandmother; Hamilton County Job and Family Services approved H.C. and Y.C.'s placement in T.M.'s home; T.M. is an "approved relative foster parent;" Hamilton County Job and Family Services obtained temporary legal custody of H.C. and Y.C. in

---

[3] The Court previously granted Plaintiffs' unopposed Motion to Proceed Using Pseudonyms to protect the identity of the minor Plaintiffs and the disclosure of, *inter alia*, their involvement in the foster care system, financial means, mental health, and other special needs. (Doc. 27).

April 2020; no one affiliated with Hamilton County has informed T.M. of the availability of foster care maintenance payments under Title IV-E of the Social Security Act; and, in Hamilton County, the amount of foster care maintenance payments under Title IV-E of the Social Security Act provided to licensed foster caregivers ranges from $1,500.00 to $9,667.00 per month for two children, with higher payments available for foster children with special needs. (*Id.* ¶ ¶ 16, 22, 40).

### ii. Plaintiffs B.F. and D.R.

Plaintiffs allege that B.F. is two years old; D.R. is her grandmother; the Franklin County Department of Job and Family Services Children's Services Division approved B.F.'s placement in D.R.'s home; D.R. is an "approved relative foster parent;" the Franklin County Children's Services Division obtained temporary legal custody of B.F. in April 2019; and no one affiliated with Franklin County has informed D.R. of the availability of foster care maintenance payments under Title IV-E of the Social Security Act. (*Id.* ¶¶ 17, 23).

### iii. Plaintiffs T.E., K.T., and T.T.

Plaintiffs allege that T.E. is one year old; K.T. and T.T. are his aunt and uncle; the Cuyahoga County Department of Job and Family Services Children Services Division obtained temporary legal custody of B.F. in November 2019; the Cuyahoga County Department of Job and Family Services Children Services Division approved T.E.'s placement in K.T.'s and T.T's home in December 2019; K.T. and T.T. are "approved relative foster parents;" no one affiliated with Cuyahoga County has informed K.T. or T.T of the availability of foster care maintenance payments under Title IV-E of the Social Security Act; and, in Cuyahoga County, the amount of foster care maintenance payments

under Title IV-E of the Social Security Act provided to licensed foster caregivers ranges from $615.00 to $2,371.00 per month per child, with higher payments available for children with special needs. (*Id.* ¶¶ 18, 21, 24, 40).

### iv. Defendants

Plaintiffs allege that Defendant DeWine is the Governor of the State of Ohio; as Governor, among other responsibilities, Defendant DeWine serves as Ohio's chief executive and oversees cabinet departments and officials; and the Ohio Department of Job and Family Services ("ODJFS") is one such executive agency that Defendant DeWine oversees. (*Id.* ¶ 25).

Defendant Damschroder is the interim director, and executive head, of ODJFS. Plaintiffs allege that ODJFS is the state agency that is statutorily mandated to administer federal payments for foster care made pursuant to Title IV-E of the Social Security Act, and Defendant Damschroder has the authority and responsibility to adopt rules to implement this authority. (*Id.* ¶¶ 31-32). Plaintiffs allege that, in his official capacity, Defendant Damschroder has the responsibility to promulgate, administer, comply with and enforce regulations, policies, and practices necessary to carry out the terms and requirements of federal spending programs; to qualify Ohio for the receipt of federal funds under such programs; and to cooperate with other state and federal agencies for the proper administration of ODJFS programs. (*Id.*)

### b. Title IV-E of the Social Security Act

The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, also known as Title IV-E of the Social Security Act ("Title IV-E"), "is Spending Clause legislation directed at state administration of foster care and adoption assistance

services." *New York State Citizens' Coal. for Children v. Poole,* 922 F.3d 69, 77 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 956, 206 L. Ed. 2d 120 (2020); *D.O. v. Glisson*, 847 F.3d 374, 376 (6th Cir. 2017). Congress enacted Title IV-E, in part, "to strengthen the program of foster care assistance for needy and dependent children." Pub. L. 96-272,94 Stat. 500 (1980). One of the ways that Title IV-E does so is through its creation of the foster care maintenance payments program.[4] *New York State Citizens' Coal. for Children,* 922 F.3d at 73. Under Title IV-E's foster care maintenance payments program, participating states receive federal financial aid in exchange for making foster care maintenance payments on behalf of certain eligible foster children. *Id.*

To be eligible to receive federal funds under Title IV-E, a state must submit a plan to the U.S. Secretary of Health and Human Services ("the Secretary") for approval. 42 U.S.C. § 671(a). Section 671, titled "State plan for foster care and adoption assistance," details the thirty-six specific criteria that a state's plan must include to qualify for federal payments under Title IV-E. *Id.* Pertinent here, a state's plan must "provide[ ] for foster care maintenance payments in accordance with section 672." *Id.* A state's plan must also provide for the establishment or designation of a state authority that is responsible for establishing and maintaining licensing standards for foster family homes, and those standards must be reasonably in accord with the recommended standards of national organizations. *Id.* § 671(a)(10)(A). The state's plan must apply these licensing standards to any foster family home that receives Title IV-E funds. *Id.* § 671(a)(10)(B). The state's plan must also provide that waivers of any established licensing standards for

---

[4] Title IV-E also created an adoption and guardianship assistance program. *See* 42 U.S.C. § 673.

foster family homes may be made only for non-safety standards, in relative foster family homes, on a case-by-case basis, for specific children.[5] *Id.* § 671(a)(10)(D).

Other examples of requirements that a state's plan must include to qualify for federal payments under Section 671 and Title IV-E are that a state's plan must "provide[] that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards," and

> provide[] that, within 30 days after the removal of a child from the custody of the parent or parents of the child, the State shall exercise due diligence to identify and provide notice to the following relatives: all adult grandparents, all parents of a sibling of the child, where such parent has legal custody of such sibling, and other adult relatives of the child (including any other adult relatives suggested by the parents), subject to exceptions due to family or domestic violence, that—
>
> (a) specifies that the child has been or is being removed from the custody of the parent or parents of the child;
>
> (b) explains the options the relative has under Federal, State, and local law to participate in the care and placement of the child, including any options that may be lost by failing to respond to the notice; [and]
>
> (c) describes the requirements under [42 U.S.C. § 671(a)(10) regarding a State's established licensing standards] to become a foster family home and the additional services and supports that are available for children placed in such a home.

*Id.* §§ 671(a)(19), (29).

---

[5] Examples of permissible waivers are the waiver of the square footage requirement of the relative's home, the age of the caregiver, and the number of children placed in the relative's home. Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020-01, 4033 (Jan. 25, 2000); (Doc. 50-2 PageID 1217) (Log No. ACYF-CB-IM-20-08, Information Memorandum (2020)).

Once the Secretary approves a state's plan under Section 671, Section 672(a)(1), titled "Foster care maintenance payments program," provides that:

> Each State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care if--
>
> (A) the removal and foster care placement met, and the placement continues to meet, the requirements of [Section 672(a)(2)]; and
>
> (B) the child, while in the home, would have met the [Aid to Families with Dependent Children ("AFDC")] eligibility requirement of [Section 672(a)(3)].

*Id.* § 672(a)(1). Section 672(a)(1), therefore, restricts the class of children eligible for foster care maintenance payments. One way that Section 672(a)(1) so restricts is that the removal and foster care placement of a child must meet specific requirements. For example, after removal, the child must be in the custody of the state's agency that administers the state's plan. *Id.* § 672(a)(2)(B). Another example is that the child must be placed in a "foster family home." *Id.* § 672(a)(2)(C). Title IV-E defines "foster family home" as "the home of an individual or family that is licensed or approved by the State in which it is situated as a foster family home that meets the standards established for the licensing or approval." *Id.* § 672(c)(1)(A).

A second way that Section 672(a)(1) restricts the class of children eligible for foster care maintenance payments is the requirement that the child—while in "the home of a relative" referenced in Section 672(a)(1)'s first sentence—would have met the AFDC eligibility requirement. This AFDC income eligibility requirement requires the child to have

been eligible for AFDC based on the now-defunct[6] AFDC 100% need standard that was in effect on July 16, 1996.

Section 675, titled "Definitions," defines what constitutes a "foster care maintenance payment" under Title IV-E. 42 U.S.C. § 675(4)(A). This section provides that foster care maintenance payments are payments to cover the cost of, and the cost of providing,

> food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.

*Id.*

Section 674, titled "Payments to States," describes when a state is entitled to reimbursement from the federal government under Title IV-E. After the state pays foster care maintenance payments on behalf of each eligible child, the state may seek partial reimbursement from the federal government. 42 U.S.C. § 674. "Briefly put, states are entitled to reimbursement of a percentage of payments made under Section 672, as well as other costs including training and information systems expenditures." *New York State Citizens' Coal. for Children*, 922 F.3d at 77 (citing 42 U.S.C. § 674(a)(1),(3)).

### c.  Foster Care in Ohio

Ohio operates a state-supervised, county-administered foster care system. Title 51 of the Ohio Revised Code is devoted to regulating public welfare, and Chapter 5103 is devoted to establishing ODJFS and placing children into temporary homes. *Ohio Dep't of Job & Family Servs. v. Lifeway for Youth, Inc.*, 2007-Ohio-6183,

---

[6] In 1996, the Temporary Assistance for Needy Families program, also known as "TANF," replaced the AFDC program. *Walton v. Hammons*, 192 F.3d 590, 591 (6th Cir. 1999).

¶ 6, 173 Ohio App. 3d 648, 651, 879 N.E.2d 861, 863. Ohio Revised Code § 5103.03 grants ODJFS extremely broad discretion over certification of foster care homes. *See id.* In this regard, the Ohio Revised Code and Ohio Administrative Code refer to a foster home "certificate." *See, e.g.*, Ohio Rev. Code §§ 5103.03(B)(2) (ODJFS shall issue a "certificate" when requirements are met), 5103.031 (a "certificate" shall not be issued to foster home unless preplacement trainings are completed). For purposes of this Opinion & Order, the terms "license" and "licensed," as used in Title IV-E, and the terms "certificate" and "certified," as used in the Ohio Revised and Administrative Codes, mean the same thing. (Doc. 50 PageID 1084); (Doc. 51 PageID 1230).

### i. Title IV-E State Plan

Ohio has an approved Title IV-E state plan that it last amended on January 11, 2018.[7] AGENCY PLAN FOR TITLE IV-E OF THE SOCIAL SECURITY ACT FOSTER CARE AND ADOPTION ASSISTANCE STATE OF OHIO, https://jfs.ohio.gov/ocf/2018-Ohio-Title-IV-E-State-Plan-amended-1-30-18.stm, (last visited July 29, 2021); *cf.* 45 C.F.R. § 1356.20(d) ("Once the title IV-E plan has been submitted and approved, it shall remain in effect until amendments are required."). Ohio has thus agreed to be bound by all of the federal requirements under Title IV-E. *Adoptive Family #1 v. Warren Cty., Ohio/Warren Cty. Bd. of Commissioners*, No. 1:18-CV-179, 2018 WL 3117513, at *4 (S.D. Ohio June 25, 2018), *objections overruled*, No. 1:18-CV-179, 2018 WL 4854616 (S.D. Ohio Oct. 5, 2018).

Ohio enacted statutes and regulations to implement its participation in the foster care maintenance payments program under Title IV-E. *See, e.g.*, Ohio Rev. Code.

---

[7] The Court may take judicial notice of undisputed information contained on government websites. *See Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009); *cf.* Fed. R. Evid. 902(5).

§ 5101.141 ("Foster care and adoption assistance payments"); Ohio Admin. Code § 5101:2-47-10 ("Reimbursement for Title IV-E foster care maintenance (FCM) costs for a foster home"). ODJFS is the designated state agency charged with administering foster care maintenance payments made pursuant to Title IV-E. Ohio Rev. Code. § 5101.141(B)(1). While ODJFS supervises the foster care maintenance payments, Ohio's individual counties are tasked with actually issuing foster care maintenance payments to eligible foster family homes in compliance with Title IV-E. *Id.* § 5101.141(C); *see* Ohio Admin. Code § 5101:2-47-10.

Additionally, Ohio has implemented 42 U.S.C. § 671(a)(10)(D)'s waiver provision and permits waivers of certain non-safety related licensing standards, for relative foster homes, for specific children in care, on a case-by-case basis. (Doc. 50-2 PageID 1216, 1226) (Log No. ACYF-CB-IM-20-08, Information Memorandum (2020)). Not all states permit such waivers. (*Id.* at PageID 1216-17, 1225-26).

### ii. Kinship Support Program

On December 29, 2020, while the parties were briefing responses to Plaintiffs' Motion for a Preliminary Injunction in this matter, Defendant DeWine signed Amended Substitute Senate Bill 310 ("S.B. 310") into law, and the law went into effect the same day. Ohio Rev. Code § 5101.881. S.B. 310 establishes Ohio's "kinship[8] support program"

---

[8] Ohio defines "kingship caregiver" as any of the following who is 18 years of age or older and is caring for a child in place of the child's parents:
 (A) The following individuals related by blood or adoption to the child:
   (1) Grandparents, including grandparents with the prefix "great," "great-great," or "great-great-great";
   (2) Siblings;
   (3) Aunts, uncles, nephews, and nieces, including such relatives with the prefix "great," "great-great," "grand," or "great-grand";
   (4) First cousins and first cousins once removed.
 (B) Stepparents and stepsiblings of the child;

("KSP"). The new law provides that ODJFS "shall coordinate and administer the program to the extent funds are appropriated and allocated for this purpose," *id.*, and that the director of ODJFS "may adopt rules for the administration of the [KSP], *id.* § 5101.8811. Defendant DeWine directed ODJFS "to establish a methodology to provide kinship caregivers, . . . , with kinship support payments no later than June 1, 2021 and to issue eligible kinship caregivers support payments retroactively from [December 29, 2020]." (Doc. 34-2) (Executive Order 2020-43D).

Ohio's KSP shall pay kinship caregivers who receive placement of a child in the temporary or permanent custody of a public children services agency, or under the Title IV-E agency with legal responsibility for the care and placement of the child, and do not have foster home certification. Ohio Rev. Code § 5101.884.  Payments under Ohio's KSP "shall be ten dollars and twenty cents per child, per day, to the extent funds are available." *Id.* § 5101.885.

Under Ohio's KSP, payments shall be made to kinship caregivers: for not more than nine months after December 29, 2020, if a child has been placed with the kinship caregiver as of December 29, 2020; for not more than nine months after the placement of a child with the kinship caregiver, if the placement occurs during the nine-month period that begins on December 29, 2020; or, for not more than six month after the date of placement of a child with the kinship caregiver, if the placement occurs after the nine-month period that began on December 29, 2020. *Id.* § 5101.886.

---

(C) Spouses and former spouses of individuals named in divisions (A) and (B) of this section;
(D) A legal guardian of the child;
(E) A legal custodian of the child;
(F) Any nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties.
Ohio Rev. Code §§ 5101.85, 5101.88(B).

Payments under Ohio's KSP end when any of the following occur: the kinship caregiver obtains foster home certification; the six- or nine-month period in Ohio Revised Code § 5101.886 runs; or the child's placement with the kinship caregiver is terminated or otherwise ceases. *Id.* § 5101.887.

If a kinship caregiver obtains foster home certification, the kinship caregiver "shall receive foster care maintenance payments equal to the custodial agency rate as determined by the certifying agency, which is either the custodial agency, private child placing agency, or private non-custodial agency." *Id.* § 5101.889.

### d. Current Lawsuit

This is a putative class action against Defendants in their official capacities only. (Doc. 1-1). Plaintiffs, under 42 U.S.C. § 1983, bring one count against Defendants for alleged violations of their statutory rights under Title IV-E and seek declaratory and injunctive relief.[9] (*Id.*) Plaintiffs argue that Defendants' failure to make foster care maintenance payments to "approved relative foster parents," on behalf of eligible relative foster children, violates Defendants' statutory obligations under 42 U.S.C. § 672. (*Id.*) Plaintiffs subsequently filed a Motion for Preliminary Injunction. (Doc. 21).[10]

Defendant DeWine filed a combined Motion to Dismiss and Response in Opposition to the Motion for Preliminary Injunction. (Doc. 34). With respect to his Motion to Dismiss, he contends that Plaintiffs' claim is moot, the Eleventh Amendment of the U.S.

---

[9] Plaintiffs' Complaint does not include constitutional claims for violations of their right to familial association or to equal protection or due process. *See, e.g., Glisson*, 847 F.3d at 376; *Adoptive Fam. #1*, 2018 WL 3117513, at *3.

[10] Plaintiffs also filed a Motion for Class Certification. (Doc. 19). During a December 16, 2020 telephone status conference, the Court ordered the parties to complete the briefing on the Motion for a Preliminary Injunction and Motions to Dismiss before briefing Defendants' responses to the Motion for Class Certification.

Constitution ("Eleventh Amendment") bars this lawsuit, and he is not a proper party. (*Id.*) With respect to his Response in Opposition, he argues that Plaintiffs have no likelihood of success on the merits of their claim, Plaintiffs will not suffer any irreparable harm, the balance of the harms weighs against injunctive relief, and an injunction is not in the public interest. (*Id.*)

Defendant Damschroder filed a Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Doc. 35) and, later, a Motion to Dismiss (Doc. 49). With respect to his Response in Opposition, he argues that Plaintiffs will not suffer any irreparable harm, Plaintiffs have not established a substantial likelihood of success on the merits of their claim and, alternatively, that the case is moot or barred by the Eleventh Amendment. (Doc. 35). With respect to his Motion to Dismiss, Defendant Damschroder asserts that Plaintiffs fail to state a claim, the Eleventh Amendment bars this action, and, alternatively, the case is moot with respect to all or some of the Named Plaintiffs. (Doc. 49).

## II. <u>ANALYSIS</u>

### a. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state." U.S. CONST. amend. XI. "The Supreme Court has interpreted this amendment as granting States broad sovereign immunity from federal suits filed by their own citizens as well as citizens of other States." *Huff v. First Energy Corp.*, No. 5:12CV2583, 2013 WL 3715174, at *5 n.6 (N.D. Ohio July 15, 2013) (citing *Pennshurst State School & Hospital v. Halderman*, 465 U.S. 89, 120-21 (1984)). Indeed,

"Eleventh Amendment immunity 'bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens'" *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (quoting *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993)). There are, however, three exceptions to a state's Eleventh Amendment immunity: when the state has consented to suit; when Congress has clearly and expressly abrogated the state's immunity; and when the exception set forth in *Ex parte Young* applies. *Puckett v. Lexington-Fayette Urban Cnty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

The first and second exceptions do not apply in this matter. Ohio has not consented to suit by statute or conduct in this litigation, and 42 U.S.C. § 1983 does not abrogate Eleventh Amendment immunity. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (Congress did not intend to disturb the States' Eleventh Amendment immunity by passing 42 U.S.C. § 1983) (internal quotations omitted); *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999) (Ohio has not waived sovereign immunity in federal court); *cf. Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) (appearing in court to present certain defenses does not necessarily waive immunity).

The third exception, the *Ex parte Young* exception, applies in this matter. Under this exception, a federal court may issue prospective injunctive and declaratory relief, but not retrospective relief or damage awards, against individuals in their official capacities under 42 U.S.C. § 1983. *McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000) (citing *Will*, 491 U.S. at 70-71). Pertinent here, under this exception, "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with

14

federal law, regardless of whether compliance might have an ancillary effect on the state treasury." *Huff*, 2013 WL 3715174, at *5; *accord Will*, 491 U.S. at 71 n.10; *Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011) ("An *Ex parte Young* action may be commenced only against a state official acting in her official capacity and may 'seek [only] prospective relief to end a continuing violation of federal law'"); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). Indeed, "in suits concerning a state's payment of public benefits under federal law, a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forward—even if the court may not order those officers to pay out public benefits wrongly withheld in the past." *Price v. Medicaid Dir.*, 838 F.3d 739, 747 (6th Cir. 2016).

Plaintiffs' Complaint meets the requirements of the *Ex parte Young* exception because, with respect to their sole claim, Plaintiffs seek prospective injunctive and declaratory relief requiring Defendants, state officials in their official capacities, to comply with their alleged obligations under 42 U.S.C. § 672, a federal statute, to provide the same foster care maintenance payments to "approved relative foster parents" as provided to licensed, non-relative foster parents. (Doc. 1-1); *see Will*, 491 U.S. at 71; *Price*, 838 F.3d at 747; *Whitfield*, 639 F.3d at 257; *S & M Brands, Inc.*, 527 F.3d at 507; *D.O. v. Beshear*, No. CV 5:15-048-DCR, 2016 WL 1171532, at *3 (E.D. Ky. Mar. 23, 2016), *rev'd on other grounds and remanded sub nom. D.O. v. Glisson*, 847 F.3d 374 (6th Cir. 2017). That Plaintiffs' request could have a direct and substantial impact on the state treasury is not fatal to the Eleventh Amendment analysis for their claim. *See Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (explaining that the *Edelmen* "exception, which had its genesis in *Ex parte Young*, permits federal courts to enjoin state officials to conform their conduct to

requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." (internal citation omitted) (citing *Edelman v. Jordan*, 415 U.S. 651, 667 (1974)); *see also Edelman*, 415 U.S. at 668 (holding that the suit at issue was proper to the extent that it sought "payment of state funds [ ] as a necessary consequence of compliance in the future with a substantive federal-question determination"). As the relief requested in Plaintiffs' Complaint is for future compliance with a federal statute, rather than a payment of monetary relief alone, the Court holds that Eleventh Amendment immunity does not bar Plaintiffs' sole claim. *See Milliken*, 433 U.S. at 289; *Edelman*, 415 U.S. at 667; *Beshear*, 2016 WL 1171532, at *3.

### b. Defendant DeWine's Motion to Dismiss

As explained above, under the *Ex parte Young* exception to Eleventh Amendment immunity, federal courts have jurisdiction over certain suits to enjoin state officials from interfering with federal rights. However, each state official sued "must have, by virtue of the office, some connection with the alleged [improper] act or conduct of which the plaintiff complains." *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013) (quoting *Floyd v. Cnty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012)). "A plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged [statutory] violations." *Id.* at 634 (citing *Floyd*, 454 F. App'x at 499).

Plaintiffs fail to adequately allege how Defendant DeWine, as Governor, is involved in the alleged failure to make Title IV-E foster care maintenance payments to "approved relative foster parents" on behalf of eligible relative foster children. The Complaint alleges that Defendant DeWine serves as the Governor and also includes various campaign promises, press statements, and policy goals of his relating to Ohio's children and kinship

16

care of foster children generally in Ohio. (Doc. 1-1 ¶¶ 25-29). Defendant DeWine's role as Ohio's chief executive is insufficient to subject him to this suit. *See Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 674 (S.D. Ohio 2017) ("Indeed, [w]ere the law otherwise, the exception would always apply. Governors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex parte Young*. The exception would become the rule.") (citations and internal quotation marks omitted). Moreover,  the alleged campaign promises, press statements, and policy goals do not provide a sufficient connection between Defendant DeWine and the alleged federal statutory violation. *Cf. id.* ("While the Governor [of Ohio] may direct broad policy initiatives to the various state agencies through his Office of Health Transformation, the agencies retain responsibility for the direct enforcement of those policies.").

Plaintiffs allege that ODJFS is "the state agency responsible for the statewide administration and oversight of Ohio's child welfare system;" ODJFS is the state agency statutorily mandated to administer federal payments for foster care made pursuant to Title IV-E; the director of ODJFS "has the authority and responsibility to adopt rules to implement this authority;" and that, "[p]er ODJFS policy, licensed foster parents receive a daily per diem rate for each foster child placed in the home," while "approved relative foster homes" do not. (*Id.* ¶¶ 2, 32, 39) (internal quotation marks omitted). Plaintiffs allege no comparable connection to oversight, administration, or payment for Defendant DeWine. In short, Plaintiffs do not properly allege a connection between Defendant DeWine and the alleged statutory violations under 42 U.S.C. § 672 for purposes of Eleventh Amendment immunity. *See Top Flight Ent., Ltd.*, 729 F.3d at 634. Defendant

17

DeWine is entitled to immunity under *Ex parte Young*,[11] and the Court will grant his Motion to Dismiss on this basis.

### c. Defendant Damschroder's Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss the Complaint if Plaintiffs fail to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 8 provides that all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

Plaintiffs argue that ODJFS's failure to make foster care maintenance payments to "approved relative foster parents" on behalf of their relative foster children violates ODJFS's obligations under 42 U.S.C. § 672. (Doc. 1-1). Plaintiffs allege that they fulfill every condition of eligibility for foster care maintenance payments under Section 672 and those Plaintiffs who are relative foster caregivers are "approved" "foster family homes" for purposes of Title IV-E. (*Id.* ¶¶ 6, 7, 34). Defendant Damschroder argues that Plaintiffs fail to state a claim, as Plaintiffs who are relative foster caregivers are neither "licensed" nor

---

[11] Defendant DeWine moves to dismiss the claim asserted against him on the grounds that the Court lacks jurisdiction over the claim because he is entitled to Eleventh Amendment immunity and, alternatively, on the grounds that Plaintiffs fail to state a claim. (Doc. 34 PageID 687, 697-700). "A motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction is a proper vehicle to assert Eleventh Amendment immunity." *Lee Testing & Eng'g, Inc. v. Ohio Dep't of Transp.*, 855 F. Supp. 2d 722, 725 (S.D. Ohio 2012). The Court will thus not address Defendant DeWine's alternate arguments made under Rule 12(b)(6).

"approved" "foster family homes," as those terms are used under Title IV-E, and are thus not eligible for foster care maintenance payments under 42 U.S.C. § 672. (Doc. 49 PageID 1056-61); (Doc. 54 PageID 1275-83). The question for the Court is thus whether Plaintiffs' Complaint states a claim upon which relief can be granted under 42 U.S.C. § 672.

### i. Federal statutory language, regulatory language, and agency guidance

42 U.S.C § 672(a)(1) mandates that "[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care if—(A) the removal and foster care placement met, and the placement continues to meet, the requirements of [Section 672(a)(2)]; and (B) the child, while in the home, would have met the AFDC eligibility requirement of [Section 672(a)(3)]." Section 672(a)(2)(C), in turn, requires that the child be placed in a "foster family home."[12] Section 672(c)(1)(A), in turn, defines "family foster home" as "the home of an individual or family" "that is licensed or approved by the State in which it is situated as a family foster home that meets the standards established for the licensing or approval."

In the definitional section of the regulations promulgated to implement Title IV-E, the Secretary of Health and Human Services explains that

> Foster family home means, for the purpose of title IV–E eligibility, the home of an individual or family licensed or approved as meeting the standards established by the licensing or approval authority(ies), that provides 24–hour out-of-home care for children. . . . Foster family homes that are approved must be held to the same standards as foster family homes that

---

[12] Section 672(a)(2)(C) alternatively permits the child to be placed "with a parent residing in a licensed residential family-based treatment facility" or in a "child care institution." Plaintiffs do not discuss these alternative placement options in their Complaint.

are licensed. Anything less than full licensure or approval is insufficient for meeting title IV–E eligibility requirements.

45 C.F.R. § 1355.20(a).

In the 2000 amendments to the regulations, specifically those revising the definition of "foster family home," the Secretary explained that the U.S. Department of Health and Human Services ("Department") "received many comments on the definition of 'foster family home' and [] concerns regarding title IV-E eligibility and reimbursement." TITLE IV-E FOSTER CARE ELIGIBILITY REVIEWS AND CHILD AND FAMILY SERVICES STATE PLAN REVIEWS, 65 Fed. Reg. 4020-01, 4032 (Jan. 25, 2000). The Secretary noted that "[o]ne commenter expressed a belief that the statutory language of 'licensed or approved' implies that different standards are acceptable" and "[a]nother commenter suggested that to require that approval and licensure be held to the same standard is an extremely problematic higher standard than has been required in the past." *Id.* In response, the Secretary explained that the Department "did not change the requirements: (1) That approved foster family homes must meet the same standards as licensed foster family homes; or (2) that relatives must meet the same licensing/approval standards as nonrelative foster family homes." *Id.*

In the 2000 amendments, the Secretary also explained that Title IV-E, specifically Section 671(a)(1), "did not intend that there be separate standards for licensing and approval" and "[t]he licensing provisions of [Title IV-E] make no exceptions for different categories of foster care providers, including relative caretakers." *Id.* The Secretary "recognize[d] that, consistent with [42 U.S.C. § 471(a)(19)], States must consider giving preference to a relative caregiver, provided that the relative caregiver meets all relevant State child protection standards," but emphasized the Department's responsibility "to fully

20

implement the licensing and safety requirements specified in the statute by requiring that foster care homes, whether relative or nonrelative, be fully licensed by the State." *Id.* at 4033.

Also in the 2000 amendments, and in response to commentary noting that some states allow certain requirements to be waived pursuant to Section 671(a)(10)(D), the Secretary stated that, although the regulations do not address waivers, the Department's policy guide required that, "[t]o the extent that waivers are allowed, they must be granted on a case-by-case basis, based on the home of the relative and the needs of the child." *Id.* The Secretary emphasized that "the State may not exclude relative homes, as a group, from any requirements." *Id.* Similarly, in the most recent amendments to the regulations promulgated to implement Title IV-E and regarding Section 671(a)(10)(D)'s waiver provision, the Secretary reiterated that "[t]he title IV-E agency may not exclude relative homes, or any other group from the licensing requirement" in Title IV-E. TRIBAL CHILD WELFARE, 77 Fed. Reg. 896-01, 899 (Jan. 6, 2012).

Additionally, the Child Welfare Policy Manual[13] provides that "the statute and regulation require that the State use the same standards to license or approve all foster homes." U.S. DEP'T OF HEALTH & HUMAN SERVS., CHILD WELFARE POLICY MANUAL § 8.3A.8(c), question 5, (2021) (citing 42 U.S.C. § 671(a)(10); 45 C.F.R. § 4355.20), https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy _dsp.jsp?citID=26 (last visited on July 29, 2021). The Children's Bureau's December 2020 Information Memorandum, given to the state agencies that administer Title IV-E, emphasized that "[e]ncouraging and assisting relative foster care providers to become

---

[13] The Children's Bureau, an Office in the Department's Administration for Children & Families, publishes the Child Welfare Policy Manual. *Ah Chong v. McManaman*, 154 F. Supp. 3d 1043, 1055 (D. Haw. 2015).

licensed is important, since it allows families to receive greater financial support through foster care maintenance payments." (Doc. 50-2 PageID 1217) (Log No. ACYF-CB-IM-20-08, Information Memorandum (2020)).

### ii. Ohio regulatory requirements

In Ohio, before a foster child can be placed in a licensed foster caregiver's home, a foster caregiver and his or her home must meet the following general requirements to obtain foster care licensure:

- Must be at least 18 years of age.
- Must have sufficient income to financially support children and pay for shelter, as evidenced by proof of income, tax forms, and utility bills.
- Must not have physical, emotional, or mental conditions that could impair their ability to care for a child.
- No one residing in the home has a physical, emotional, or mental condition that would endanger a child.
- Must have functional literacy to be able to read and write at the level necessary to participate effectively in the community and to be able to communicate with the foster child, agency staff, and healthcare and service providers.
- No adult living in the home has been convicted of, or pleaded guilty to, any of the offenses listed in Ohio Admin. Code § 5101:2-7-02(J) and appendix A.
- Must inform the child welfare agency if a child living in the home has been convicted of, or pleaded guilty to, any offense listed in Ohio Rev. Code § 5103.0319.
- Must not have had a foster care license revoked in Ohio or another state within the past five years.
- Must undergo a physical examination and all household members must submit a medical statement.
- Must include an inspection of the home by a certified state fire safety inspector or the state fire marshal's office.
- Must complete 36 hours of preplacement training as stated in Ohio Admin. Code § 5101:2-5-33, including, at a minimum: training regarding the rights and responsibilities of foster parents, effects of caregiving on children's families, communicable diseases, community health and social services available to children and their families, the reasonable and prudent parent standard, cultural diversity, first aid and CPR, medication administration, and requirements for reporting child abuse and neglect. The foster parent must complete additional training after certification.

Ohio Admin. Code § 5101:2-7-02 ("General requirements for foster caregivers and applicants"); *see also id*. § 5101:2-5-20 ("Initial application and completion of the foster care homestudy").

Also in Ohio, an appropriate Ohio county public children services agency ("PCSA") or private child placing agency ("PCPA") may approve the placement of a foster child with a relative caregiver who is not a licensed foster caregiver. *Id*. § 5101:2-42-18 ("PCSA and PCPA approval of placements with relative and nonrelative substitute caregivers"), effective July 1, 2021 https://codes.ohio.gov/assets/laws/administrative-code/authenticated/5101/2/42/5101$2-42-18_20210701.pdf. A relative caregiver and his or her home must meet only the requirements found in Ohio Administrative Code § 5101:2-42-18(B) before a PCSA or PCPA may approve placement of a foster child with the relative caregiver. *Id.* Specifically, prior to approving the placement of a foster child with a relative caregiver, the appropriate PCSA or PCPA must:

- Collect identifying information on the prospective caregiver and all household members.
- Require all adults in the home to identify prior involvement with a children services agency.
- Search the statewide automated child welfare information system for the prospective caregiver and adult household members.
- Assess the safety of the home by checking for its cleanliness and absence of hazardous conditions inside and outside, storage of poisons and otherwise dangerous materials, proper heating, lighting and ventilation, condition of plumbing facilities, working smoking alarms on each level of the home, safe storage of weapons, adequacy of child's bedding, and access to a working telephone for emergency situations.
- Provide the prospective caregiver with known information regarding educational, medical, prescription and nonprescription medications, child care, and special needs of the child including information on how to access support services to meet the needs of the child.
- Assess the prospective caregiver's ability and willingness to provide care and supervision of the child and to provide a safe and appropriate placement for the child.

- Submit fingerprints for the prospective caregiver and all adult household members.
- Complete a criminal record check on the prospective caregiver and all household members.
- Complete a review of the national sex offender registry for the prospective caregiver and all adult household members.
- Require the prospective caregiver to inform the child welfare agency if a child living in the home has been convicted of, or pleaded guilty to, any offense listed in Ohio Rev. Code § 5103.0319.
- Provide the prospective caregiver with the following information:
  - Information about the KSP.
  - How to apply for Ohio Works First ("OWF") child-only financial assistance and Medicaid coverage.
  - **The caregiver's right to apply for licensure as a foster caregiver.**
  - **How to apply for licensure as a foster caregiver.**
  - **The requirements for foster caregiver licensure and how those requirements differ from the requirements for approval as a relative or nonrelative substitute caregiver.**
  - The difference in payment between OWF child-only payments, KSP payments, and the foster care per diem.
  - The difference (if any) in the eligibility for supportive services.
  - The caregiver's right to be heard during hearings involving the child(ren) if the placement is approved.

Ohio Admin. Code § 5101:2-42-18(B) (emphasis added). This regulation also provides that, when the home of the prospective relative substitute caregiver is already a licensed foster home, the PCSA or PCPA must notify the recommending agency of the intent to place the kinship child in the licensed foster home. *Id.*

A review of Ohio's regulatory requirements for licensure as a foster caregiver and approval of placement of a foster child with a relative caregiver reveals that licensed foster caregivers and unlicensed relative foster caregivers are subject to different standards before a foster child can be placed in their respective homes. For example, there are fewer disqualifying criminal offenses for unlicensed relative caregivers than for licensed foster homes. *Compare* Ohio Admin. Code § 5101:2-42-18(B) (11)-(12), *with* Ohio Admin. Code 5101:2-7-02(J), appendix A. Moreover, although both types of foster care providers

are subject to a criminal background check, the background check standards vary. *Compare* Ohio Admin. Code § 5101:2-42-18(B)(12), *with* Ohio Admin. Code § 5101:2-7-02(K), (M)-(O). Additionally, approval of placement with a relative caregiver does not require the same safety and training standards as licensure as a foster caregiver. *Compare* Ohio Admin. Code § 5101:2-7-02(Y) (requiring 36 hours of pre-placement training for licensed homes and additional trainings after licensure), *with* Ohio Admin. Code § 5101:2-42-18(B) (no trainings required). As a final example, licensure as a foster caregiver requires the submission of information regarding the applicant foster caregivers' physical, emotional, and mental health whereas approval as relative caregiver does not require prospective caregivers to submit such health information. *Compare* Ohio Admin. Code § 5101:2-7-02, *with* Ohio Admin. Code § 5101:2-42-18(B). Additionally, Ohio Administrative Code § 5101:2-42-18 provides that "[t]he requirements for foster caregiver certification [*i.e.*, licensure] approval . . . differ from the requirements for approval as a relative or nonrelative substitute caregiver." *Id.* § 5101:2-42-18(B)(8)(e).

### iii. Holding

Plaintiffs do not allege that Plaintiffs who are relative foster caregivers are licensed by ODJFS as foster caregivers. *See, e.g.*, (Doc. 1-1 ¶¶ 6 22-24, 34, 57). Rather, Plaintiffs allege that Plaintiffs who are relative foster caregivers are "approved relative foster parents" by ODJFS and are entitled to foster care maintenance payments under Title IV-E in light of this approval. (Doc. 1-1).

Section 672's statutory language predicates eligibility for foster care maintenance payments on the foster child's placement in a foster family home. 42 U.S.C. § 672. The statutory language then predicates foster family home eligibility on state licensure or

approval of the home, and the Court holds this statutory language to mean that an "approved" relative caregiver is not eligible for foster care maintenance payments under Title IV-E unless the state "approval" standards are the same standards that the state uses for licensing foster caregivers. Caregivers who may be approved as relative foster caregivers as the term "approved" is used under Ohio Administrative Code § 5101:2-42-18, or used colloquially, are not "approved" under 42 U.S.C. § 672 if they are subject to lesser standards than their licensed foster counterparts. Plaintiffs, who are relative foster caregivers but are not licensed by ODJFS as foster caregivers, are not "approved" as foster caregivers as the term "approved" is used in Section 672. Plaintiffs who are relative caregivers are not "licensed or approved" "foster family homes" under Title IV-E and thus are not eligible for payments under Title IV-E. Plaintiffs therefore fail to state a claim upon which relief can be granted under 42 U.S.C. § 672. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

45 C.F.R. § 1355.20(a), and its regulatory history, discussed above, support this holding. *See* 45 C.F.R. § 1355.20(a) ("Foster family homes that are approved must be held to the same standards as foster family homes that are licensed."); *see, e.g.*, TITLE IV-E FOSTER CARE ELIGIBILITY REVIEWS AND CHILD AND FAMILY SERVICES STATE PLAN REVIEWS, 65 Fed. Reg. 4032 (explaining that the Department "did not change the requirements: (1) That approved foster family homes must meet the same standards as licensed foster family homes; or (2) that relatives must meet the same licensing/approval standards as nonrelative foster family homes."). The Child Welfare Policy Manual's statement that "the statute and regulation require that the State use the same standards to license or approve all foster homes" is likewise instructive. CHILD WELFARE POLICY

MANUAL § 8.3A.8(c). Similarly, the Children's Bureau's reminder to encourage relative foster caregivers to become licensed to receive greater financial support, through foster care maintenance payments, suggests that full state licensure is required before a state can request partial reimbursement from the federal government under Title IV-E. *See* (Doc. 50-2 PageID 1217) (Log No. ACYF-CB-IM-20-08, Information Memorandum (2020)).

### iv. Plaintiffs' reliance on *D.O. v. Glisson*

Contrary to Plaintiffs' argument otherwise, the U.S. Court of Appeals for the Sixth Circuit's ("Sixth Circuit") decision in *D.O. v. Glisson*, 847 F.3d 374 (6th Cir. 2017), is not dispositive of the issue of whether a related, non-licensed foster caregiver in Ohio is an "approved" "foster family home" under 42 U.S.C. § 672. In *Glisson*, the Sixth Circuit held that Title IV-E confers an individually enforceable right to foster care maintenance payments and foster families can enforce that right under 42 U.S.C. § 1983.[14] 847 F.3d at 378, 381.

The Sixth Circuit noted that, if a state's "failure to make [foster care] maintenance payments turns on the distinction between relative and non-relative foster care providers, it plainly violates federal law." *Id.* at 383. Ohio, though, does not distinguish foster caregivers based on relative status but on whether a caregiver and his or her home has been licensed under Ohio law. Stated differently, Ohio is not declining to pay Plaintiffs federal foster care maintenance payments because Plaintiffs are related; instead, Ohio is

---

[14] *Accord New York State Citizens' Coalition for Children*, 922 F.3d 69; *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974 (9th Cir. 2010). *But see Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013) (holding that Title IV-E does not confer a privately enforceable right to foster care maintenance payments under Section 1983); *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) (same).

declining to pay Plaintiffs federal foster care maintenance payments because Plaintiffs who are relative caregivers are not licensed foster caregivers under Ohio law and Title IV-E requires a caregiver to be fully licensed by the state before a caregiver is eligible for foster care maintenance payments. Moreover, although the Sixth Circuit found that the appellant in that case, a great aunt of a foster child in Kentucky, was an approved foster care provider under Title IV-E because Kentucky conducted a standard home evaluation and criminal background check prior to placing the child in her care, the Sixth Circuit's finding hinges on the application of Kentucky's child welfare laws to the facts of that individual appellant. *See id.* at 384. The facts of this case require this Court to apply Ohio's child welfare laws to the facts of the individual Plaintiffs, and this Court will not extend the finding in *Glisson* regarding the appellant's status as an approved foster care provider under Title IV-E to the Plaintiffs' case.

### v.  Summary

As a final matter, the Court is compelled to note that this holding is not one that the Court takes lightly. Although eligible non-licensed relative caregivers can now receive state-provided payments under Ohio's KSP, the Court acknowledges Plaintiffs' dissatisfaction with the new program in light of its limited available time-period, unequal payment amount when compared to Plaintiffs' licensed foster caregiver counterparts, lack of supplementary payment amount for children with special needs, and contingency on funds being available in the Ohio Treasury. The Court acknowledges that foster children, one of Ohio's most helpless and vulnerable populations, and the relatives who care for them, certainly deserve more. The Court recognizes that a foster child's need for food, clothing, shelter, daily supervision, school supplies, personal incidentals, and travel does

not vary by the licensure status of the home in which the children lay their heads down at night. The Court also recognizes that non-licensed foster caregivers in Ohio are called to do much of the same work as their licensed foster caregiver counterparts, but must do that work on a fraction of the provided payment. This difference in payment due to a difference in placement, in a licensed home or not, is neither ideal nor even satisfactory. However, the Court is bound by the language in 42 U.S.C. 672. And here, Plaintiffs fail to state a claim under 42 U.S.C. § 672, as they do not adequately allege that they are "licensed" or "approved" "foster family homes" as those terms are used in Title IV-E.[15]

### III. <u>CONCLUSION</u>

For the foregoing reasons, it is hereby **ORDERED** Defendant DeWine's Motion to Dismiss (Doc. 34) is **GRANTED**, as he is entitled to Eleventh Amendment immunity; Defendant Damschroder's Motion to Dismiss (Doc. 49) is **GRANTED**, as Plaintiffs fail to state a claim upon which relief can be granted; and Plaintiffs' Motions for Class Certification (Doc. 19) and for a Preliminary Injunction (Docs. 19, 21) are each **DENIED as moot**. This matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

   **IT IS SO ORDERED.**     _/s Michael R. Barrett_____
                       Michael R. Barrett, Judge
                       United States District Court

---

[15] As the Court holds that Plaintiffs fail to state a claim, it need not reach Defendant Damschroder's arguments that the establishment of Ohio's KSP moots this case or that certain Plaintiffs lack standing. (Doc. 49 PageID 1065-71).